1

2

3

4

5

6                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
7                                    AT SEATTLE

8

9    CASCADE FINANCIAL CORPORATION
     and CASCADE BANK,
10
                        Plaintiffs,                    C07-1106Z
11
     v.                                                ORDER
12
     ISSAQUAH COMMUNITY BANK,
13   CAPITAL BANCORP, LTD. and ROBERT
     M. ITTES,
14
                        Defendants.
15

16

17        On September 25, 2007, the Court denied Plaintiffs' Motion for Preliminary

18   Injunction, docket no. 9, after having considered the briefs and declarations in support of and

19   in opposition to the motion, and the law.  The Court now issues this written opinion

20   explaining the basis for its denial of the motion for preliminary injunction.

21   BACKGROUND

22        A.    The Parties

23        Plaintiff Cascade Bank is a full-service financial institution with over 20 offices in

24   Snohomish and King Counties, offering a full range of banking services.  Nelson Decl.,

25   docket no. 17, ¶ 5.  Cascade Bank presently has two banks in Issaquah – the first bank

26   opened in 1989, and the second bank, which was formerly known as Issaquah Bank, began

     operating as Cascade Bank in September 2005.  Crego Decl., docket no. 27, Ex. 2 (Nelson

ORDER   1–

1 Dep.) at 26:12-16.  Plaintiff Cascade Financial Corporation is the financial holding

2 corporation for Cascade Bank.  Nelson Decl. ¶ 4.

3      Defendant Issaquah Community Bank opened for business on July 16, 2007.  Nelson

4 Decl. ¶ 18, Ex. 7 (Issaquah Community Bank's website).  Defendant Capitol Bancorp Ltd. is

5 a holding company with fifty-four individually chartered community banks, including

6 Issaquah Community Bank.  Giovanelli Decl., docket no. 28, ¶ 6, Ex. 1.  Defendant Robert

7 M. Ittes served as President of Issaquah Bank from the time it was founded, in 1992, until it

8 was acquired in 2004 by Cascade Financial Corporation.  Nelson Decl. ¶ 13.  At that time,

9 Mr. Ittes became President of the Issaquah Bank Division of Cascade Bank and continued in

10 that position until he terminated his employment effective April 30, 2005.  Id.; see also Ittes

11 Decl., docket no. 30, ¶ 7.  Mr. Ittes is now the President and Chief Executive Officer

12 ("CEO") of Defendant Issaquah Community Bank.  Nelson Decl. ¶ 18.

13     **B.**    **Present Lawsuit and Motion**

14      On July 16, 2007, Cascade Bank and Cascade Financial Corporation ("Plaintiffs"),

15 filed suit against Issaquah Community Bank, Capitol Bancorp Ltd., and Robert M. Ittes

16 ("Defendants"), alleging four claims: (1) Lanham Act unfair competition, (2) common law

17 trademark infringement and unfair competition, (3) infringement of Washington State

18 trademark registration, and (4) violation of the Washington Consumer Protection Act.

19 Compl., docket no. 1,  ¶¶ 37-51.  Plaintiffs served the summons and complaint on

20 Defendants on or before July 18, 2007.  Acceptances of Service, docket nos. 3-5.

21      On August 1, 2007, Plaintiffs filed the present Motion for Preliminary Injunction,

22 docket no. 9, seeking to enjoin Defendants from offering banking services in connection with

23 or otherwise using the trademark ISSAQUAH COMMUNITY BANK, which allegedly

24 infringes on Plaintiffs' ISSAQUAH BANK trademark for banking services.

25

26

ORDER  2–

1

**C.      Issaquah Bank's Operations Between 1992 and 2004**

2      Issaquah Bank started using the ISSAQUAH BANK trademark in Issaquah,

3  Washington in July 1992.  Jolley Decl., docket no. 13, Ex. 3.[1]   In 1997, Issaquah Bank

4  established a branch office in North Bend, Washington.  Nelson Decl. ¶ 10, Ex. 3 (Wash.

5  State Dep't of Fin. Institutions, Division of Banks website).

6

**D.      Registered ISSAQUAH BANK Trademark**

7      On March 18, 1993, the Washington Secretary of State issued Washington State

8  Trademark Registration No. 22069 for the ISSAQUAH BANK mark, along with its logo

9  with the line below the trademark and trees to the left, for use in connection with "all bank

10 advertising, letterhead, checks, credit/debit cards, signage," to Issaquah Bank.  Jolley Decl.

11 Ex. 3.  The registration was valid for ten years, i.e., until March 18, 2003.  Id.  On November

12 18, 2002, Issaquah Bank renewed the ISSAQUAH BANK trademark registration, thus

13 extending its validity through March 18, 2009.  Id., Ex. 4.  Mr. Ittes, who was the President

14 of Issaquah Bank in November 2002, signed the renewal application on behalf of Issaquah

15 Bank.  Id., Ex. 4.  His signature follows a declaration that provides:

16

17      Applicant [Issaquah Bank] is the owner of and is now using the trademark
       identified above; I believe no other individual or entity has the right to use such
       trademark in connection with the same or similar goods or services in this state
18     either in identical or in such a near manner as might be mistaken therefore.

19 Id., Ex. 4.

20

**E.      Cascade Financial Corporation's Acquisition of Issaquah Bank**

21     On June 4, 2004, Cascade Financial Corporation acquired Issaquah Bankshares, Inc.

22 and Issaquah Bank.  Nelson Decl. ¶ 8.  Issaquah Bankshares, Inc. was merged into Cascade

23 Financial Corporation, and Issaquah Bank was merged into Cascade Bank.  Id.  At the time

24

25

26 [1] Plaintiffs' motion, at page 10, clarifies that the Issaquah Bank mark was used in the
   formation activities in 1992, and that Issaquah Bank opened for business in early 1993.

ORDER   3–

1  of acquisition, the goodwill associated with the Issaquah Bank business was valued at $25.2

2  million.  Id. ¶ 11, Ex. 4 (Cascade Financial 2006 Annual Report).

3    **F.**  **Plaintiffs' Use of ISSAQUAH BANK Mark after the June 4, 2004**

4      **Merger**

5    Cascade Bank's Marketing Director, Daniel Lampard, and its President and CEO,

6  Carol Nelson, submit declarations in support of the preliminary injunction motion, docket

7  nos. 15 and 17, asserting Cascade Bank's continued use of the Issaquah Bank name after the

8  merger.  A cross-examination of Mr. Lampard and Ms. Nelson during subsequent

9  depositions clarified their declaration statements, as outlined below.

10      **1.**  **Marketing Materials**

11    Mr. Lampard's declaration submits copies of "various Issaquah Bank marketing

12  materials" maintained by Cascade Financial Corporation and Cascade Bank.  Lampard Decl.

13  ¶ 4, Ex. 1.  The materials consist of undated advertisements using the ISSAQUAH BANK

14  mark.  Id.  At Mr. Lampard's deposition, he clarifies that none of the marketing materials

15  attached to his declaration were created since he has been employed by Cascade Bank, i.e.,

16  since October 10, 2006.  Crego Decl., Ex. 1 (Lampard Dep.) at 9:11-15, 9:23-10:2.  Mr.

17  Lampard then admits that he does not know if any of the advertisements were created and

18  published prior to the acquisition of Issaquah Bank by Cascade.  Id., Ex. 1 (Lampard Dep.) at

19  10:9-24, 12:2-3.  Mr. Ittes, on the other hand, asserts that these advertisements predate the

20  acquisition of Issaquah Bank by Cascade Bank.  Ittes Decl. ¶ 7.  When Mr. Lampard is asked

21  at his deposition whether there have been any advertisements or other instances of the bank's

22  use of the Issaquah Bank mark since he has been employed by Cascade, he answers that he is

23  aware of no such advertisements or instances.  Crego Decl., Ex. 1 (Lampard Dep.) at 12:4-

24  20.

25

26

ORDER  4–

## 2.    <u>Chamber of Commerce, Salmon Days and Golf Tournament</u>

Ms. Nelson's declaration states that at the time of the merger, on June 4, 2004:

> Issaquah Bank had built a strong reputation in the community and valuable goodwill associated with its ISSAQUAH Bank name and trademark, due to its long history of offering banking services, as well as its advertising campaign. Issaquah Bank was, *and continues to be*, involved in community organizations, such as the Issaquah Chamber of Commerce.  Similarly, Issaquah Bank sponsored community events such [as] the Issaquah Salmon Days Festival and was the primary sponsor for a local golf tournament.

Nelson Decl. ¶ 9 (emphasis added).  In her deposition, she testifies:

> Q: Is an entity called Issaquah Bank a current member of the Issaquah Chamber of Commerce?
>
> A: I don't know exactly.
>
> * * *
>
> Q: Did you check the Issaquah [Chamber of] Commerce membership listing before signing your declaration?
>
> A: No.

Crego Decl., Ex. 2 (Nelson Dep.) at 7:25-8:2, 8:8-11.  She then admits that Issaquah Bank did not appear on a listing of the Banks and Savings and Loans of the Issaquah Chamber of Commerce that was supplied by opposing counsel at her deposition, and agrees with opposing counsel that her declaration statement regarding Issaquah Bank's continued involvement with the Chamber of Commerce must be incorrect.  <u>Id.</u>, Ex. 2 at 8:16-9:5, and Ex. 17 (Issaquah Chamber of Commerce listing of bank members).  Defendants point out that only Cascade Bank, and not Issaquah Bank, is a sponsor of a recent August 16, 2007 Issaquah Chamber of Commerce event.  Crego Decl., Ex. 13.

Regarding the Salmon Days festival and the Salmon Days golf tournament, Ms. Nelson also admits during her deposition that Issaquah Bank was a sponsor in 2004, but that

ORDER  5–

only Cascade Bank was a sponsor in 2005 and 2006.  Id., Ex. 2 (Nelson Dep.) at 9:13-16:14.
Her testimony is as follows:

> Q: Isn't it the case, Ms. Nelson, that Issaquah Bank has not sponsored a
> community event such as the Issaquah Days – Salmon Days Festival or the
> associated golf tournament since 2004?
>
> A: Yes.
>
> * * *
>
> Q: [F]rom 2005 forward, Cascade's sponsorship of those community events
> and golf tournament has been alone and not in conjunction or using in any way
> the Issaquah Bank mark?
>
> A: That is correct.

Id., Ex. 2 (Nelson Dep.) at 15:23-16:2, 16:10-14.

Defendants also point out that Issaquah Bank is not listed in the August 1, 2007 newspaper insert of "Issaquah's Business Yearbook," nor is it listed in the Qwest Dex official phone directory for the Greater Eastside, which includes Issaquah.  Ittes Decl. ¶¶ 4, 5, Exs. 2, 3.

### 3.   Continued Use of Issaquah Bank Trade Name After Merger

Ms. Nelson's declaration asserts that the two Issaquah Bank branch offices (in Issaquah and North Bend) continued to use the Issaquah Bank name after the merger:

> After the acquisition and merger, Issaquah Bank was operated as the Issaquah
> Bank Division of Cascade Bank.  Both Issaquah and North Bend branches
> continued to operate under the 'Issaquah Bank' name . . .

Nelson Decl. ¶ 12.  This statement fails to specify the dates of such operations.  It is undisputed that the two branches operated as the Issaquah Bank Division of Cascade Bank only from June 2004 through September 2005, and thereafter both branches operated solely under the Cascade Bank name.  Nelson Decl. ¶ 14 (discussing the transition of the branch names from Issaquah Bank to Cascade Bank in September 2005); Palmer Decl., docket no.

ORDER  6–

31, ¶¶ 4, 5 ("In September 2005, Cascade Bank ceased using the name 'Issaquah Bank Division of Cascade Bank' and became known solely as Cascade Bank").  As of August 6, 2007, there was no visible signage outside or inside the Cascade Bank location at 1055 NW Maple Street, Issaquah referring to the former Issaquah Bank.  Hedrick Decl., docket no. 29, ¶¶ 2-4.  None of the promotional materials available at the bank referred to Issaquah Bank. Id. ¶ 4, Ex. 1.

**4.** **Banking Services under the ISSAQUAH BANK Trademark after the Merger**

Despite the name change in September 2005 from Issaquah Bank to Cascade Bank, Ms. Nelson's declaration asserts that Cascade Bank continued to use the Issaquah Bank trademark after the merger in connection with offering banking services:

> After the acquisition and merger, . . . [b]oth Issaquah and North Bend branches continued . . . to offer banking services under the ISSAQUAH BANK trademark.

> In September 2005, Cascade Bank . . . continu[ed] to use the ISSAQUAH BANK mark [to] offer banking services.

> Cascade Bank continues to build on the goodwill associated with the ISSAQUAH BANK mark by offering financial products and services under the mark and special bank promotions that highlight our longevity in the community, and by continuing to sponsor community events and participate in community organizations.

Nelson Decl. ¶¶ 12, 14, 15.  When pressed at her deposition on the topic of Cascade Bank's offer of banking services under the ISSAQUAH BANK mark, Ms. Nelson testifies that she cannot point to any specific documents that were disseminated to the public after September 2005 bearing the words Issaquah Bank.  Crego Decl., Ex. 2 (Nelson Dep.) at 22:8-19.

There is abundant testimony that the name change was implemented by not only changing the name of the branch offices, but also changing the name on all of the materials disseminated by the bank to the public.  The former manager of the North Bend branch, Kari

ORDER  7–

1    Palmer, submits a declaration contending that as part of the name change in September 2005,

2    all Issaquah Bank signage, stationary, advertising materials, and deposit slips from the

3    customer areas were removed.  Palmer Decl. ¶ 5.  Cascade Bank sent information to all of its

4    customers explaining the name change, and informing them that accounts, loans, credit cards

5    and debit cards would all be transferred to Cascade Bank.  Id. ¶ 6; Ittes Decl. ¶ 2, Ex. 1.

6    Customers were also informed that their bank statements would be Cascade Bank statements.

7    Palmer Decl. ¶ 6; Ittes Decl. ¶ 2.  Similar information was posted on Cascade Bank's

8    website.  Nelson Decl. ¶ 14, Ex. 5.  Customers were informed that they could continue using

9    old Issaquah Bank checks until December 2005, and they were asked to order new checks

10   with the Cascade Bank name.  Palmer Decl. ¶ 7.  After September 2005, customers could no

11   longer order checks with the Issaquah Bank name.  Id. ¶ 9.  Plaintiffs were unable to produce

12   any documents in response to a request for production requesting "[s]amples of any customer

13   documents . . . featuring the 'Issaquah Bank' mark, delivered or sent by Cascade to its

14   customers since October 1, 2005."  Crego Decl., Ex. 3 (Responses to a Second Request for

15   Production).

16        There are two isolated examples in the record of post-September advertisements that

17   refer to Issaquah Bank.  The first advertisement, published on or around January 2007, was

18   attached as Exhibit 6 to Ms. Nelson's Declaration.  It consists of an "in branch special" that

19   was posted on a foam cork board inside the Cascade Bank branch offices.  Crego Decl., Ex.

20   2 (Nelson Dep.) at 29:25-30:5.  It states: "We celebrate serving the Issaquah Bank

21   community since 1989 by offering a 9 month CD special."  Id. ¶ 15, Ex. 6.  At her

22   deposition, however, Ms. Nelson clarifies that it was Cascade Bank that opened in 1989, not

23   Issaquah Bank, which did not open until 1992 or 1993.  Crego Decl., Ex. 2 (Nelson Dep.) at

24   18:2-19:2.  The second advertisement was also published on or around January 2007, and it

25   states: "Introducing an Issaquah Bank special" in connection with a certificate of deposit

26   ("CD") offer.  Crego Decl., Ex. 3 (Responses to First Request for Production).  These are the

ORDER  8–

1   only two advertisements produced by Plaintiffs in response to the request for production of

2   "[a]dvertisements placed by Cascade featuring the 'Issaquah Bank' mark since September 1,

3   2005."  Id.

4                       **5.      Domain Names**

5          Ms. Nelson's declaration states that Cascade Bank "continue[s] to use the domain

6   names www.issaquah-bank.com and www.issaquahbank.com to offer online banking and

7   provide information about our other banking and financial services."  Nelson Decl. ¶ 16.  At

8   her deposition, she admits that when those domain names are entered into a browser, the

9   page that comes up is Cascade Bank's home page, and that the Cascade Bank home page

10  does not mention Issaquah Bank.  Crego Decl., Ex. 2 (Nelson Dep.) at 26:21-27:14, Ex. 5

11  (Cascade Bank's home page); Ex. 7 (www.issaquah-bank.com) and Ex. 8

12  (www.issaquahbank.com).  She concludes: "I guess that's telling you that they're one in the

13  same bank."  Id., Ex. 2 (Nelson Dep.) at 27:14-15.  Plaintiffs have not provided any evidence

14  that they advertise the Issaquah Bank domain names.

15          Cascade Bank's website has a webpage (not its homepage) discussing the merger

16  between Cascade Bank and Issaquah Bank.  Crego Decl., Ex. 6.  Another Cascade Bank

17  webpage, which was removed sometime after July 30, 2007, entitled "Issaquah Bank FAQs,"

18  welcomes Issaquah Bank customers to Cascade Bank and explains how all of their services

19  are going to be provided by Cascade Bank.  Supp. Jolley Decl., docket no. 34, ¶ 3, Ex. 2.  No

20  banking services are offered in connection with the Issaquah Bank name on either of these

21  webpages.

22                       **6.      Third Party Use**

23          Plaintiffs have submitted evidence of third parties' use of the Issaquah Bank name

24  after September 2005.  Howell Decl., docket no. 12, ¶¶ 3-4, Ex. 1 (ACH Participant

25  Directory dated February - July 2007, referring to Issaquah BR[anch], a Division o . . . );

26  Jolley Decl. ¶¶ 6-7, 9-12, Ex. 5 (King County Office of Business Relationship and Economic

ORDER   9–

1    Development website), Exs. 6, 8 (Whois database), Ex. 9 (FDIC website), Ex. 10

2    (superpages.com and snoqualmiedirectory.com), Ex. 11 (Issaquah Chamber of Commerce

3    referring to advertisers); McCormick Decl., docket no. 16, ¶¶ 3-4, Ex. 1 (invoices issued to

4    Cascade Bank and/or Issaquah Bank); Racine Decl., docket no. 19, ¶¶ 3-4, Ex. 1 (lease

5    payment check made payable to Cascade Bank on behalf of Issaquah Bank).

6          Cascade Bank also continues to process Issaquah Bank deposit and withdrawal slips

7    and checks.  Crego Decl., Ex. 4 (citing 5,372 customer deposit slips, an unknown number of

8    withdrawal slips, and 67,528 checks received or processed from July 1, 2006 through the

9    present, affecting 852 accounts); Danner Decl., docket no. 10, ¶¶ 4-6, Exs. 1-3 (samples of

10   deposit and withdrawal slips and checks).

11         **G.**     **Legal and Insured Status of Issaquah Bank**

12         Issaquah Bank's corporate status is "inactive."  Crego Decl., Ex. 10 (Washington

13   Secretary of State website).  Issaquah Bank is not listed on the Washington Department of

14   Financial Institutions ("DFI") listing for commercial banks and savings institutions.  Id., Ex.

15   11 (DFI's website).  As of August 9, 2007, Issaquah Bank was not listed as an FDIC insured

16   institution in Washington.  Id., Ex. 12 (FDIC list).  Ms. Nelson was asked at her deposition:

17         Q: [W]as it your understanding . . . that the status of Issaquah Bank as an
         insured state non-member bank was terminated as of June 4, 2004?

18
           A: Yes.

19

20   Crego Decl., Ex. 2 (Nelson Dep.) at 36:22-37:1.

21         **H.**     **Issaquah Community Bank's Opening**

22         Issaquah Community Bank was incorporated on July 10, 2007, and opened for

23   business on July 16, 2007.  Jolly Decl. Ex. 13; Nelson Decl. ¶ 18, Ex. 7.  Prior to opening,

24   the Washington Department of Financial Institutions approved the name Issaquah

25   Community Bank.  Giovanelli Decl. ¶ 14.  This approval indicates that the name is not

26   currently registered by another bank or financial institution in Washington State; the

ORDER   10–

1    approval process does not involve any trademark assessment.  Williamson Decl., docket no.

2    35, ¶¶ 4, 5.  Issaquah Community Bank asserts that it chose its name because incorporating

3    the name of the community is very important to Capital Bancorp when naming its affiliate

4    banks, and using "community" reflects that it is a community bank in Issaquah.  Giovanelli

5    Decl. ¶¶ 7, 10.  Of Capital Bancorp's fifty-four banks, six include a geographic reference and

6    fifteen include the word "community" in their name, of which fourteen follow the template

7    of _____ Community Bank.  Id. ¶ 8, Ex. 2.  Bank of Issaquah was its first choice, but that

8    name had been reserved by someone else.  Id. ¶ 9.  The President of the Northwest Region

9    for Capitol Bancorp, Thomas Giovanelli, asserts that "[w]e did not choose the name Issaquah

10   Community Bank in order to capitalize on any good will associated with the former Issaquah

11   Bank," and that "[o]ur selection of this location [close to Cascade Bank] did not have

12   anything to do with the location of Cascade Bank's Issaquah location."  Id. ¶¶ 11, 15; see

13   Hedrick Decl. ¶ 5, Ex. 2 (map showing various Issaquah banks).

14         **I.    <u>Plaintiffs' Awareness of Defendants' Plans to Open Issaquah Community</u>**

15              **<u>Bank</u>**

16         Cascade Bank's President and CEO, Ms. Nelson, acknowledges that "In January

17   2007, I became aware that Robert Ittes was involved in establishing a new bank that was to

18   be called 'Issaquah Community Bank.'"  Nelson Decl. ¶ 17.  On February 19, 2007,

19   Plaintiffs' counsel, Jennifer Jolley, sent a letter to Capital Bancorp's counsel demanding that

20   Issaquah Community Bank adopt a different name to avoid confusion with the Issaquah Bank

21   name.  Jolley Decl. ¶ 17, Ex. 16.  Senior Legal Counsel for Capital Bancorp. Ltd. promptly

22   responded, asserting that there would be no consumer confusion and that any action by

23   Issaquah Community Bank to change or alter its name is unnecessary because Issaquah Bank

24   is no longer doing business.  Id. ¶ 18, Ex. 17.  Plaintiffs' counsel responded by letter on

25   March 6, 2007, re-asserting Plaintiffs' position and stating that if Issaquah Community Bank

26

1   would not agree to adopt another name that is not likely to create confusion by March 12,

2   2007, then Cascade Bank "will be forced to pursue other avenues to enforce its rights." Id.,

3   ¶ 19, Ex. 18.  No further communications between counsel have been submitted into the

4   record.

5       **J.    Anticipated Impact of Preliminary Injunction on Issaquah Community**

6           **Bank**

7           Issaquah Community Bank has incurred expenses to design and print promotional

8   items and banking materials bearing the name Issaquah Community Bank, including debit

9   cards, stationary, checks, internal proof items, marketing and customer handouts, and

10  promotional items such as pens and cups.  Giovanelli Decl. ¶ 17.  Issaquah Community Bank

11  also has a website.  Id., ¶ 13, Ex. 3.  Its external signage consists of two 2' x 5' banners with

12  the name "Issaquah Community Bank" and logo.  Karmali Decl., docket no. 14, ¶ 4.  These

13  expenses would have to be incurred again if forced to change its name.  Id.  In addition to the

14  direct financial cost, Issaquah Community Bank would incur administrative expenses to

15  changes its name through state and federal regulators, and to issue stock.  Id. ¶¶ 18, 19, 21.

16  Issaquah Community Bank customers would also face inconvenience because they would be

17  required to order new checks and debit or credit cards, and they might have difficulty

18  accessing their accounts during a transition time.  Id. ¶ 20.  If required to change its name,

19  Issaquah Community Bank would have to contact vendors who supply key bank services,

20  such as routing checks and facilitating debit transactions, and changes could take 30 to 60

21  days.  Id. ¶ 21.

22  **DISCUSSION**

23      **A.    Preliminary Injunction Standard**

24          A preliminary injunction is appropriate where the movant can demonstrate either: "(1)

25  a likelihood of success on the merits and the possibility of irreparable injury; or (2) that

26  serious questions going to the merits were raised and the balance of hardships tips sharply in

ORDER   12–

1  its favor." <u>Clear Channel Outdoor, Inc. v. City of Los Angeles</u>, 340 F.3d 810, 813 (9th Cir.

2  2003) (citation omitted).  "These two formulations represent two points on a sliding scale in

3  which the required degree of irreparable harm increases as the probability of success

4  decreases." <u>Sammartano v. First Jud. Dist. Ct.</u>, 303 F.3d 959, 965 (9th Cir. 2002) (citation

5  omitted).  "In cases where the public interest is involved, the district court must also examine

6  whether the public interest favors the plaintiff." <u>Id.</u> (citation omitted).

7  **B.** **Affirmative Defense of Abandonment**

8  The Court first addresses the affirmative defense of abandonment prior to turning to

9  the analysis of Plaintiffs' likelihood of success on the merits of their Lanham Act unfair

10  competition claim because the abandonment analysis affects the likelihood of success

11  analysis.

12  The owner of a trademark cannot exclude others from using the trademark if it has

13  been abandoned.  The Ninth Circuit has not squarely held whether the party asserting

14  abandonment is required to prove abandonment by a clear and convincing standard or a

15  preponderance of the evidence standard. <u>Grocery Outlet Inc. v. Albertson's Inc.</u>, --- F.3d ---,

16  2007 WL 2264702, at ** 3-4 nn.3, 4 (9th Cir. Aug. 9, 2007) (compare J. Wallace's

17  concurrence, advocating a clear and convincing standard, with J. McKeown's concurrence,

18  rejecting a clear and convincing standard).[2]  "The Lanham Act defines abandonment as (1)

19  discontinuance of trademark use and (2) intent not to resume such use." <u>Electro Source,</u>

20  <u>LLC v. Brandess-Kalt-Aetna Group, Inc.</u>, 458 F.3d 931, 935 (9th Cir. 2006).  The statute

21  provides:

22

23  A mark shall be deemed to be "abandoned" if either of the following occurs:

24  (1) When its use has been discontinued with intent not to resume such use.
   Intent not to resume may be inferred from circumstances.  Nonuse for 3

25

26  [2] The Court concludes that in this case, under either standard, Defendants present a strong
   case of abandonment for the reasons stated in this Order.

ORDER   13–

consecutive years shall be prima facie evidence of abandonment. 'Use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

(2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

15 U.S.C. § 1127, Para. 16.  Regarding the first element of abandonment, i.e., the discontinuance of trademark use, the Ninth Circuit holds that "[a]bandonment requires complete cessation or discontinuance of trademark use." Electro Source, 458 F.3d at 938. "Even a single instance of use is sufficient against a claim of abandonment of a mark if such use is made in good faith." Id. (quoting Carter-Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794, 804 (9th Cir. 1970)).  "Evaluating whether a use is in the 'ordinary course of trade' is often an intensely factual undertaking." Id. at 940.  Courts are guided by:

> [F]actors such as the genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the marked service [or product] in an appropriate segment of the public mind as those of the holder of the mark, the scope of the [trademark] activity relative to what would be a commercially reasonable attempt to market the service [or product], the degree of ongoing activity of the holder to conduct the business using the mark, the amount of business transacted.

Id. (quoting Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1159 (9th Cir. 2001)). Regarding the second element of abandonment, i.e., the intent not to resume such use, the Ninth Circuit has noted that "[t]here is a difference between intent not to abandon or relinquish and intent to resume use in that an owner may not wish to abandon its mark but may have no intent to resume its use . . . An 'intent to resume' requires the trademark owner to have plans to resume commercial use of the mark." Grocery Outlet, 2007 WL 2264702, at *4 n.4.

ORDER   14–

1    Defendants argue that the ISSAQUAH BANK trademark has become unenforceable

2    because Plaintiffs abandoned it in September 2005 when they changed the name from

3    Issaquah Bank to Cascade Bank.  Because the period of alleged discontinued use is less than

4    three years, the statutory presumption of abandonment does not apply.  "Nevertheless,

5    abandonment may be inferred from the circumstances in cases where there has been a shorter

6    period of discontinued use."  Intrawest Fin. Corp. v. Western Nat'l Bank of Denver, 610 F.

7    Supp. 950, 958 (D. Colo. 1985).

8    The only post-September 2005 uses of the ISSAQUAH BANK mark by *Plaintiffs* are:

9    (1) the two in-branch advertisements for CDs, published in or around January 2007, and (2)

10   the domain names www.issaquah-bank.com and www.issaquahbank.com.  One of the in-

11   branch advertisements states: "We celebrate serving the Issaquah Bank community since

12   1989 by offering a 9 month CD special," and the second advertisement states: "Introducing

13   an Issaquah Bank special."  Crego Decl., Ex. 3.  Not only is the first advertisement's

14   reference to 1989 referring to Cascade Bank's opening, but also *both* advertisements refer

15   customers to the cascadebank.com website and Cascade Bank's toll-free number as the

16   source of the services.  Thus, there are significant questions as to whether Plaintiffs' use of

17   the ISSAQUAH BANK mark in these in-branch advertisements could be deemed to have

18   been used to indicate the source of the services in the sense of Section 1127 of the Lanham

19   Act, when the source of the services is indisputably Cascade Bank.  See Intrawest Fin. Corp.,

20   610 F. Supp. at 959 ("It is implausible that the customers in IntraWest Bank's, and then First

21   Interstate Bank's safe deposit department depended upon the [First National Bank of Denver]

22   mark to identify the source of services."); Exxon Corp. v. Humble Exploration Co., 695 F.2d

23   96, 100-01 (5th Cir. 1983) ("No sales were made that depended upon the HUMBLE mark for

24   identification of source. . . . That is, the HUMBLE mark did not with these sales play the

25   role of a mark.").  Moreover, in one advertisement, the Issaquah Bank name describes the

26   "community" not the services offered by the bank.  Lastly, the bona fide nature of these

ORDER   15–

1   references to Issaquah Bank is put into question because the January 24, 2007 date of the

2   advertisements indicates that they were erected after the plans to form Issaquah Community

3   Bank became public knowledge.  See Exxon, 695 F.2d at 101 ("The Act does not allow the

4   preservation of a mark solely to prevent its use by others.").

5        Similarly, there are significant questions as to whether the mere use of the domain

6   names www.issaquah-bank.com and www.issaquahbank.com constitutes a bona fide

7   commercial use of the ISSAQUAH BANK mark sufficient to disprove abandonment when

8   these domain names direct customers to the Cascade Bank website, which contains no offer

9   of banking services by Issaquah Bank.

10       As Defendants point out, when the ISSAQUAH BANK mark was registered, the

11  registration claimed the name would be used on "all bank advertising, letterhead, checks,

12  credit/debit cards, signage."  Jolley Decl. Ex. 3.  Other than the two in-branch advertisements

13  described above, Plaintiffs have failed to submit any advertisements or other uses of the

14  ISSAQUAH BANK mark since October 1, 2005.  Cascade Bank cannot point to a single

15  document that it provided to its customers since October 1, 2005 featuring the ISSAQUAH

16  BANK mark.  Although Ms. Nelson proclaims that "it has always been our intent to continue

17  to use and build on the strong goodwill associated with the ISSAQUAH BANK mark

18  through use of the mark," Supp. Nelson Decl., docket no. 33, ¶ 6, "[o]bjective evidence of

19  intent not to resume use may outweigh subjective testimony to the contrary."  Intrawest Fin.

20  Corp., 610 F. Supp. at 958.  Plaintiffs' argument that they have continued their commercial

21  use of the ISSAQUAH BANK mark is wholly unsupported by the record, as outlined in the

22  Background section.  All of Plaintiffs actions demonstrate an intent to abandon the Issaquah

23  Bank name in connection with all of Cascade Bank's banking services.  It is no wonder that

24  Plaintiffs resisted (albeit unsuccessfully) Defendants' efforts to take limited depositions prior

25  to responding to the preliminary injunction motion.  The depositions of Mr. Lampard and

26  Ms. Nelson exposed the misleading statements in their respective declarations, which had

ORDER   16–

1   attempted to demonstrate widespread continued use of the ISSAQUAH BANK mark in the
2   community and in connection with the offer of banking services.

3       The fact that Cascade Bank continues to process old deposit and withdrawal slips and
4   checks featuring the Issaquah Bank name fails to demonstrate that Cascade Bank "used or
5   displayed in the sale or advertising of services" the ISSAQUAH BANK mark.  15 U.S.C.
6   § 1127; see Emergency One, Inc. v. Am. FireEagle, Ltd., 228 F.3d 531, 536-37 (4th Cir.
7   2000) (holding that the continued provision of exclusive warranty and repair services on
8   American Eagle trucks after the cessation of the manufacture of such trucks did not
9   constitute a "bona fide use of a mark in the ordinary course of trade" under Section 1127 to
10  disprove a claim of abandonment of the American Eagle mark).  The Fourth Circuit in
11  Emergency One noted that "[e]xclusive repair and recycling services like those offered by
12  E-One might be sufficient commercial use of the mark to prevent abandonment, but only if
13  E-One used the mark on the repaired or remanufactured goods or on documents associated
14  with the goods or their sale." Id. at 536.  In Emergency One, the repaired and recycled
15  trucks left the factory with only the E-One mark, not the American Eagle mark.  Id. at 537.
16  In the present case, when Cascade Bank receives outdated materials, "Cascade Bank's Bank
17  Operations notifies the branches and requests that they contact their customers and
18  encourage them to order new documents." Crego Decl., Ex. 4; Palmer Decl. ¶ 9.  The record
19  shows that Cascade Bank has taken affirmative steps to encourage its customers to *stop* using
20  the Issaquah Bank mark.

21      Defendants argue that outdated references to Issaquah Bank by third parties are
22  insufficient to demonstrate any commercial use *by Cascade Bank*.  Plaintiffs respond that
23  "[t]hird-party public use of a name or mark has been held to inure to the benefit of the
24  claimant of the rights, even if the claimant itself has not made use of them." Pls.' Reply,
25  docket no. 32, at 3 (citing Nat'l Cable Television Ass'n, Inc. v. Am. Cinema Editors, Inc.,
26  937 F.2d 1572, 1577-78 (Fed. Cir. 1991), and Johnny Blastoff, Inc. v. Los Angeles Rams

ORDER  17–

1   Football Co., 188 F.3d 427, 434 (7th Cir. 1998)).  These cases, raised for the first time in the

2   reply brief, are not helpful.  These cases do not involve a situation where the public is using

3   an outdated mark, i.e., a mark that the owner no longer uses.

4       Defendants have demonstrated a likelihood of success on their affirmative defense of

5   abandonment, thus precluding a finding for Plaintiffs at this time of a likelihood of success

6   on the merits of Plaintiffs' claim for unfair competition under the Lanham Act.

7       **C.    Plaintiffs' Likelihood of Success on the Merits of their Claim for Unfair**

8           **Competition under the Lanham Act[3]**

9       "To establish . . . an unfair competition claim under section 43(a) of the Lanham Act,

10  15 U.S.C. § 1125(a),[4] [Cascade Bank][5] must establish that [Issaquah Community Bank] is

11  using a mark confusingly similar to a valid, protectable trademark of [Cascade Bank]."

12  Brookfield, 174 F.3d at 1046 n.6.  More precisely, at the preliminary injunction stage,

13  Cascade Bank must establish that it is likely to be able to show, first, that it has a valid,

14  protectable trademark interest in the ISSAQUAH BANK mark, and secondly, that the public

15  is likely to be confused about the source or sponsorship of Issaquah Community Bank such

16  that they associate that bank with Issaquah Bank.  See id. at 1047, 1053 n.15.

17

18

19  [3] Plaintiffs do not move for a preliminary injunction based on a showing of a likelihood of success on their other claims.

20  [4] Plaintiffs incorrectly rely upon 15 U.S.C. § 1114(a), which is Section 32(a) of the Lanham

21  Act, and which provides for a trademark infringement action for federally registered trademarks.  There is no evidence in the record that the ISSAQUAH BANK mark is federally

22  registered.  In contrast, Section 43(a) applies to both registered and unregistered trademarks. Brookfield Commc'ns, Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1046 n.6 (9th Cir.

23  1999).  Plaintiffs' reliance on Section 1114(a) is of no material significance, however, since the same standard applies for a trademark infringement claim as for an unfair competition

24  claim.  Id. at 1046.

25

26  [5] For ease of reference, "Plaintiffs" are referred to as Cascade Bank, and "Defendants" are referred to as Issaquah Community Bank.  No legal significance should be attached to this designation.

ORDER   18–

1

2

### 1.     Plaintiffs' Ownership of a Valid, Protectable Trademark

The Lanham Act defines a "trademark" to include:

> [A]ny word, name, symbol, or device, or any combination thereof – (1) used
> by a person, or (2) which a person has a bona fide intention to use in
> commerce and applies to register on the principal register established by this
> chapter, to identify and distinguish his or her goods, including a unique
> product, from those manufactured or sold by others and to indicate the source
> of the goods, even if that source is unknown.

15 U.S.C. § 1127, Para. 10.  "The term 'use in commerce' means the bona fide use of a mark

in the ordinary course of trade, and not made merely to reserve a right in a mark."  Id., 15

U.S.C. § 1127, Para. 15.  "For purposes of this chapter, a mark shall be deemed to be in use

in commerce . . . on services when it is used or displayed in the sale or advertising of

services and the services are rendered in commerce, or the services are rendered in more than

one State or in the United States and a foreign country and the person rendering the services

is engaged in commerce in connection with the services."  Id.

Cascade Bank argues that the mark has been in continuous use since the opening of

the first Issaquah Bank branch in 1993.  Plaintiffs assert that they have not abandoned the

ISSAQUAH BANK mark.  Pls.' Mot. at 11 ("While Plaintiffs no longer use their

ISSAQUAH BANK mark as the name of the bank, they continue to use the mark in

commerce in connection with banking services").  This argument is addressed in detail above

in the context of Defendants' affirmative defense of abandonment.  In summary, Defendants

have put forward a strong showing of abandonment, and Cascade Bank's ownership of a

valid trademark is thus in doubt.

In support of its argument that it has a valid trademark, Cascade Bank also argues that

"Cascade's state registration of its mark and its 13 years of continuous and exclusive use of

ORDER   19–

1    its mark constitute prima facie evidence of the validity of the mark and its exclusive right to

2    use the mark on the services specified in the registration."  Pls.' Mot. at 13 (citing RCW

3    19.77.040).  Although Defendants do not address this argument in their opposition, the

4    argument appears problematic because Cascade Bank did not register this mark.  Issaquah

5    Bank did.  And Issaquah Bank is no longer in existence as a state chartered bank.  There is

6    no evidence in the record that Issaquah Bank assigned its rights in the ISSAQUAH BANK

7    mark to Cascade Bank for use in connection with banking services.  Cf. Intrawest, 610 F.

8    Supp. at 955 (discussing the assignment of trademark rights).  Moreover, Plaintiffs have

9    provided no legal authority that a *state* registration of a trademark confers a presumption of

10   validity under the Lanham Act.  The Court will not presume that Cascade Bank owns a valid

11   mark based upon the state registration.

12           In addition to validity, Cascade Bank must show that the ISSAQUAH BANK mark is

13   "protectable."  "Trademarks are categorized as generic, descriptive, suggestive, and arbitrary

14   or fanciful."  M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1080 (9th Cir. 2005)

15   (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992)). "A generic mark is

16   the least distinctive, and an arbitrary or fanciful mark is the most distinctive." Id. (citing

17   GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1207 (9th Cir. 2000)).  Plaintiff asserts

18   that the ISSAQUAH BANK mark is descriptive on the spectrum of distinctiveness.  "[A]

19   descriptive mark is not inherently distinctive;" however, "[i]t may nevertheless be entitled to

20   protection if it has acquired distinctiveness through secondary meaning."  Official Airline

21   Guides, Inc. v. Goss, 6 F.3d 1385, 1391 (9th Cir. 1993).  "A suggestive or descriptive mark,

22   which is conceptually weak, can have its overall strength as a mark bolstered by its

23   commercial success."  M2 Software, 421 F.3d at 1081 (collecting Ninth Circuit cases).

24           Plaintiffs submit evidence of commercial success.  Issaquah Bank's assets grew from

25   just under $12.4 million at the end of 1993 to $130 million by March 2004.  Jolley Decl., Ex.

26   9.  Similarly, total deposits grew from $9.8 million at the end of 1993 to just over $67

ORDER   20–

million[6] by March 2004.  Id.  Plaintiffs also assert that they have demonstrated secondary meaning "through their long use and advertising of the mark, as well as their community involvement."  Pls.' Mot. at 12-13.  Although Defendants do not dispute Plaintiffs' evidence of commercial growth between 1993 and 2004, Defendants point out that since September 2005, Plaintiffs have not advertised the ISSAQUAH BANK mark, nor have they participated in community events using the mark.[7]  Plaintiffs have submitted no evidence of secondary meaning after 2004, and no evidence of any customer association between the ISSAQUAH BANK mark and Cascade Bank.  Accordingly, Plaintiffs are likely to be able to show secondary meaning only through 2004, or, at best, through 2005, but are unlikely to be able to show secondary meaning after 2005.

## 2.    Likelihood of Customer Confusion

The likelihood of confusion determination asks "whether the similarity of the marks is likely to confuse customers about the source of the products."  GoTo.com, 202 F.3d at 1205 (internal citation and quotation omitted).  The alleged infringer's "use of a mark must be likely to confuse an *appreciable* number of people as to the source of the product . . . that there are a few consumers who do not pay attention to obvious differences and assume common sources where most other people would not, may not demonstrate the requisite likelihood of confusion."  Entrepreneur, 279 F.3d at 1151 (emphasis in original).  "In determining whether confusion between related goods is likely, the following factors are relevant: 1. strength of the mark; 2. proximity of the goods; 3. similarity of the marks; 4. evidence of actual confusion; 5. marketing channels used; 6. type of goods and the degree of care likely to be exercised by the purchaser; 7. defendant's intent in selecting the mark;

---

[6] Exhibit 9 to the Jolley Declaration appears to show that the total deposits were $105 million, not $67 million, by March 2004.

[7] See Defs.' Opp'n at 20 (Defendants discussed secondary meaning in their "strength of the mark" analysis rather than in the context of whether Plaintiffs own a protectable mark.).

ORDER   21–

1   and 8. likelihood of expansion of the product lines." <u>AMF, Inc. v. Sleekcraft Boats</u>, 599

2   F.2d 341, 348-49 (9th Cir. 1979) (abrogated in part on other grounds by <u>Mattel, Inc. v.

3   Walking Mountain Prods.</u>, 353 F.3d 792, 810 n.19 (9th Cir. 2003)).  "The <u>Sleekcraft</u> factors

4   are . . . a guide to decision-making, intended to channel the analytical process, but not dictate

5   any result."  <u>Entrepreneur</u>, 279 F.3d at 1141 (internal citation and quotation omitted).  "Some

6   factors are much more important than others, and the relative importance of each individual

7   factor will be case-specific."  <u>Brookfield</u>, 174 F.3d at 1054.  "Although some factors – such

8   as the similarity of the marks and whether the two companies are direct competitors – will

9   always be important, it is often possible to reach a conclusion with respect to likelihood of

10  confusion after considering only a subset of the factors."  <u>Id.</u>; <u>see</u> <u>also</u> <u>GoTo.com</u>, 202 F.3d

11  at 1205 (similarity of marks, relatedness of goods, and marketing channels found to be the

12  three most important <u>Sleekcraft</u> factors in the context of the web).

13  **a.      Strength of the Mark**

14          The strength of the mark analysis is related to the secondary meaning analysis

15  regarding the issue of whether Plaintiffs own a protectable mark.  As discussed above,

16  Plaintiffs' ISSAQUAH BANK mark is a descriptive mark for which there is no evidence of

17  secondary meaning since 2004.  Once Issaquah Bank changed its name to Cascade Bank in

18  September 2005, no banking services were offered under the Issaquah Bank name; thus, it is

19  not surprising that there is no evidence of commercial success associated with the

20  ISSAQUAH BANK mark after 2004.  Moreover, "Issaquah" is a "weak" geographic

21  reference.  <u>See</u> <u>Bank of Texas v. Commerce Southwest, Inc.</u>, 741 F.2d 785, 787 (5th Cir.

22  1984) (noting combination of "bank" with geographic term lacks distinctiveness); Crego

23  Decl. ¶ 9, Ex. 9 (Washington Secretary of State listing of more than 140 businesses that start

24  with the word "Issaquah").  All banks must include the word "bank" in their name.

25  Accordingly, Plaintiffs' are unlikely to be able to show that the ISSAQUAH BANK is a

26

1    strong mark, even though the descriptive mark was likely protectable as a trademark through

2    2004 or 2005.  This "strength of the mark" <u>Sleekcraft</u> factor weighs in favor of Defendants.

3              **b.**        <u>**Proximity of the Goods**</u>

4          "When dealing with the second <u>Sleekcraft</u> factor, the courts assess whether the goods

5    are related or complementary."  <u>M2 Software</u>, 421 F.3d at 1081-82 (citing <u>Sleekcraft</u>, 599

6    F.2d at 350).  "For related goods, the danger presented is that the public will mistakenly

7    assume there is an association between the producers of the related goods, though no such

8    association exists."  <u>Sleekcraft</u>, 599 F.2d at 350.

9          Plaintiffs argue that "Defendants' services are identical to Cascade's services and

10   offered in the same geographic area."  Pls.' Mot. at 16; Nelson Decl. ¶ 19.  Defendants

11   agree: "[I]t is true that Issaquah Community Bank's services are similar to Cascade Bank's."

12   Defs.' Opp'n, docket no. 26, at 19.  However, Defendants argue, the relatedness of the

13   services between these two banks is not likely to confuse customers because there are no

14   longer banking services provided by Cascade Bank under the ISSAQUAH BANK trademark.

15   In August 2007, there were no promotional materials inside Cascade Bank using the

16   ISSAQUAH BANK mark.  Hedrick Decl. ¶ 4.  Cascade Bank has not sent any materials

17   bearing the ISSAQUAH BANK mark to customers since October 1, 2005.  Crego Decl., Ex.

18   2 (Nelson Dep.) at 22:15-19, and Ex. 3 at 2 (Pls.' Resp. to Second Request for Production).

19   Defendants argue that the geographic proximity between Cascade Bank and Issaquah

20   Community Bank is also not likely to cause customer confusion because there is no longer an

21   Issaquah Bank physical location.  Because Plaintiffs do not offer any banking services under

22   the ISSAQUAH BANK mark, the relatedness between the services of Cascade Bank and

23   Issaquah Community Bank is irrelevant.  This "proximity" <u>Sleekcraft</u> factor weighs in favor

24   of Defendants.

25

26

ORDER   23–

1

### c.      Similarity of the Marks

2        "Similarity of the marks is tested on three levels: sight, sound, and meaning."

3   Sleekcraft, 599 F.2d at 351 (citation omitted).  "Each must be considered as they are

4   encountered in the marketplace."  Id.; Nutri/Sys., Inc. v. Con-Stan Indus., Inc., 809 F.2d 601,

5   605-606 (9th Cir. 1987) (affirming finding that Nutri/System and Nutri-Trim logos are

6   dissimilar as used in marketplace).  "Although similarity is measured by the marks as

7   entities, similarities weigh more heavily than differences."  Sleekcraft, 599 F.2d at 351

8   (citation omitted).

9        The words "Issaquah Bank" and "Issaquah Community Bank" are similar in sight,

10  sound and meaning.  Defendants point out that the ISSAQUAH BANK mark was registered

11  as the words "Issaquah Bank," with a line below it and trees to the left, and that this logo is

12  different from Issaquah Community Bank's logo.  Defs.' Opp'n at 1 (logos compared).

13  There is no evidence in the record of Cascade Bank's continued use of the Issaquah Bank

14  logo.  Because the Court considers the marks as they are encountered in the marketplace, the

15  differences between the logos is irrelevant.  As previously mentioned, the only post-

16  September 2005 uses of the ISSAQUAH BANK mark by *Plaintiffs* are: (1) the two in-branch

17  advertisements for CDs, published in or around January 2007, and (2) the domain names

18  www.issaquah-bank.com and www.issaquahbank.com.  The words Issaquah Bank and

19  Issaquah Community Bank are identical but for the additional word "community."

20  Defendants point out that many banks in Washington have similar names, with only one

21  word differentiating them.  Crego Decl., Ex. 12; Ittes Decl. ¶ 5.  While this may be true, it

22  does not negate the similarity between the two marks at issue here.  Accordingly, the marks,

23  as used in the marketplace, are similar, and the "similarity of the marks" Sleekcraft factor

24  favors Plaintiffs.

25

26

ORDER   24–

1

### d.   Evidence of Actual Confusion

2        "While evidence that the use of the two marks has already led to confusion is

3   persuasive proof that future confusion is likely, the converse is not true." GoTo.com, 202

4   F.3d at 1208 (internal quotation and citation omitted).  This factor is irrelevant where the

5   plaintiff "never had the opportunity to collect information on actual confusion" because the

6   suit was filed before the defendant used the allegedly infringing mark.  See Brookfield, 174

7   F.3d at 1060.

8        Here, Plaintiffs' lawsuit was filed the same day as the opening of the Issaquah

9   Community Bank; thus, there has been little opportunity for Plaintiffs to collect evidence of

10  actual confusion.  Nonetheless, Plaintiffs argue that within days of Issaquah Community

11  Bank's opening, correspondence addressed to Mr. Ittes at Issaquah Community Bank was

12  delivered to the former Issaquah Bank address.  Parrish Decl., docket no. 18, Ex. 1.

13  Plaintiffs also assert that the Puget Sound Business Journal mistakenly associated an article

14  about Issaquah Community Bank with Cascade Financial Corporation.  Nelson Decl. ¶ 21,

15  Ex. 9.  Defendants point out that these instances do not show *customer* confusion.

16  Defendants also point out that the law requires that "an appreciable number of ordinary

17  purchasers" be confused.  Entrepreneur, 279 F.3d at 1151.  Defendants submit declarations

18  of two Issaquah Community Bank employees who state that within a month of Issaquah

19  Community Bank's opening, they have been unaware of any instances of customer

20  confusion.  Giovanelli Decl. ¶ 16; Palmer Decl. ¶ 11.  The "actual confusion" Sleekcraft

21  factor is neutral.

22

### e.   Marketing Channels Used

23       "Convergent marketing channels increase the likelihood of confusion." Sleekcraft,

24  599 F.2d at 353.  The issue is not only whether "both lines [a]re sold under the same roof,"

25  but also whether the marketing channels are "parallel" such that "the general class of . . .

26  purchasers exposed to the products overlap."  Id.  In Sleekcraft, the Ninth Circuit looked for

ORDER   25–

1    similarities in sales methods employed, price ranges, and advertising and retail methods.  See

2    id.; see also Cohn v. Petsmart, Inc., 281 F.3d 837, 842 (9th Cir. 2002).

3         Because Issaquah Bank is no longer in operation, and because Cascade Bank is not

4    marketing any banking services under the ISSAQUAH BANK mark, with perhaps one

5    exception of a CD that was offered to the public in January 2007, the relatedness of Cascade

6    Bank's marketing channels to Issaquah Community Bank's marketing channels is irrelevant.

7    The use of Issaquah Community Bank's website, www.issaquahcommunitybank.com, is not

8    a source of customer confusion despite the continued registration by Plaintiffs of two

9    Issaquah Bank domain names.  The Issaquah Bank domain names direct customers to

10   Cascade Bank's website, where no services are offered under the ISSAQUAH BANK mark.

11   Thus, the Issaquah Bank domain names cannot be considered marketing channels for

12   banking services bearing the ISSAQUAH BANK mark.  This "marketing channels"

13   Sleekcraft factor favors Defendants.

14            **f.    Type of Goods and the Degree of Care Likely to be Exercised**

15                   **by the Purchaser**

16        This factor requires consideration of "the typical buyer exercising ordinary caution."

17   Sleekcraft, 599 F.2d at 353.  According to Cascade Bank's President and CEO, Carol

18   Nelson, "customers of banking services cover the spectrum in terms of education,

19   sophistication and knowledge about banking and financial services."  Nelson Decl. ¶ 7.

20   "Some customers research their various banking options before selecting a bank, while others

21   choose based on proximity and convenience."  Id.  According to Issaquah Community

22   Bank's Chairman of the Board of Directors, Thomas Giovanelli, "Capital Bancorp customers

23   tend to be highly sophisticated users of banking services and very selective about the banks

24   they choose."  Giovanelli Decl. ¶ 5.  "[I]t is not uncommon for banks operating in the same

25   region to have similar names and customers still are able to differentiate the banks."  Id. ¶ 22.

26

ORDER   26–

1  These declarations from both sides are self-serving and are given little weight. This "degree

2  of care" Sleekcraft factor is neutral.

3                          **g.      Issaquah Community Bank's Intent in Selecting the Mark**

4          "[W]hen the alleged infringer knowingly adopts a mark similar to another's,

5  reviewing courts presume that the defendant can accomplish his purpose: that is, the public

6  will be deceived." Sleekcraft, 599 F.2d at 354. However, "an intent to confuse customers is

7  not required for a finding of trademark infringement." Brookfield, 174 F.3d at 1059. "Thus,

8  the intent factor, if present, will weigh heavily in favor of finding a likelihood of confusion

9  but, if absent, will generally have no effect. eAcceleration Corp. v. Trend Micro, Inc., 408

10  F. Supp. 2d 1110, 1117 (W.D. Wash. 2006) (citing Brookfield, 174 F.3d at 1059).

11         In this case, Issaquah Community Bank undeniably had knowledge of Issaquah

12  Bank's mark, given that the former Issaquah Bank President Mr. Ittes is now the President

13  and CEO of Issaquah Community Bank. Nonetheless, Defendants have presented a

14  convincing alternative explanation for the choice of the Issaquah Community Bank name –

15  that its first choice (i.e., Bank of Issaquah) was unavailable, and the Issaquah Community

16  Bank name follows the template commonly used by Capital Bancorp's other banks (i.e.,

17  _____ Community Bank, where the blank is a geographic reference). Giovanelli Decl.

18  ¶¶ 7-11. Combined with the facts that: (1) since 2004, Issaquah Bank was no longer a

19  chartered bank in operation, and (2) since 2005, all banking services were offered under the

20  Cascade Bank name, Plaintiffs are unlikely to be able to show that Defendants adopted the

21  Issaquah Community Bank name to capitalize on the goodwill associated with the former

22  Issaquah Bank or to deceive customers. This "intent" Sleekcraft factor is either neutral or

23  favors Defendants.

24                          **h.      Likelihood of Expansion of the Product Lines**

25          "[T]his factor is not relevant and does not favor either party." Pls.' Mot. at 20.

26  Defendants argue that this factor is relevant because Plaintiffs have not provided any

ORDER   27–

1   evidence that they intend to resume use or expand services offered under the ISSAQUAH

2   BANK mark.  This factor is thus either neutral or favors Defendants.

3                    **i.        Conclusion Re: Likelihood of Confusion**

4       Although the "similarity of the marks" <u>Sleekcraft</u> factor favors Plaintiffs, all of the

5   other factors either favor Defendants or are neutral.  Plaintiffs are unlikely to be able to show

6   a likelihood of customer confusion.

7              **3.      Conclusion Re: Likelihood of Success on the Merits**

8       Plaintiffs are unlikely to succeed on the merits in showing that they own a valid and

9   protectable ISSAQUAH BANK trademark and that there is a likelihood of consumer

10  confusion as a result of Defendants' use of the Issaquah Community Bank name.

11  **D.      Irreparable Harm**

12      "In a trademark infringement claim, irreparable injury may be presumed from a

13  showing of likelihood of success on the merits." <u>GoTo.com</u>, 202 F.3d at 1205 n.4 (internal

14  citation and quotation omitted).  Because Plaintiffs are unable to show a likelihood of

15  success on the merits, they are not entitled to the presumption of irreparable harm.

16  Furthermore, "courts have held that a delay in seeking injunctive relief will undercut the

17  presumption of irreparable harm in trademark cases." <u>eAcceleration</u>, 408 F. Supp. 2d at

18  1122 (citing <u>GTE Corp. v. Williams</u>, 731 F.2d 676, 678 (10th Cir. 1984)).  In <u>eAcceleration</u>,

19  this Court denied a preliminary injunction where the plaintiff submitted a cease and desist

20  letter, but then waited approximately nine months before filing suit, and two additional

21  months before bringing its motion for a preliminary injunction.  <u>Id.</u>  This Court recognized

22  that some portion of the delay was likely the result of attempts to resolve the matter without

23  litigation, but noted that plaintiff waited until September 2005 to file the complaint, and until

24  November 2005 to file the motion for a preliminary injunction, despite the fact that the

25  defendant indicated its unwillingness to cease in using the allegedly infringing mark in

26  Spring 2005.  <u>Id.</u> n.4.

ORDER   28–

1    In the present case, Plaintiffs admit that in January 2007 they became aware of

2  Defendants' plans to open Issaquah Community Bank.  Plaintiffs promptly sent Defendants a

3  letter demanding that they change their name.  When Defendants refused, Plaintiffs sent a

4  second letter with a deadline for a response.  When no such response was received by the

5  March 12, 2007 deadline, Plaintiffs were on notice that Defendants were not going to change

6  the name.  Plaintiffs waited to file the complaint until the day that Issaquah Community

7  Bank opened, on July 16, 2007, and they waited until August 1, 2007 to file a preliminary

8  injunction motion.  This over-four-month delay undercuts Plaintiffs' assertion of irreparable

9  harm.

10    **E.    Balance of Hardships**

11    Plaintiffs have failed to demonstrate that they are likely to be able to show that they

12  own a valid, protectable trademark, that there is a likelihood of consumer confusion, and that

13  they will suffer irreparable harm.  Thus, the balance of hardships weighs in favor of

14  Defendants, who would have to incur direct and administrative expenses to change their

15  name and whose customers would be inconvenienced by such a change.

16    **F.    Public Interest**

17    In its Balance of Hardships argument, Plaintiffs assert that there will be significant

18  harm to the public interest.  Pls.' Mot. at 23.  Given the Court's finding that Plaintiffs are

19  unlikely to succeed on the merits, the harm to the public interest is unlikely.

20    **G.    Conclusion**

21    Defendants are likely to succeed on their affirmative defense of abandonment, and

22  Plaintiffs are unlikely to succeed on the merits of their Lanham Act unfair competition claim.

23  Plaintiffs have also failed to demonstrate irreparable harm.  The balance of hardships tips in

24  Defendants' favor.  Accordingly, the Court DENIES Plaintiffs' Motion for Preliminary

25  Injunction, docket no. 9.

26

ORDER   29–

1        IT IS SO ORDERED.

2        DATED this 26th day of September, 2007

3

4        _____

5        Thomas S. Zilly
         United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER   30–